UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

GREGNEISHA JOHNSON                    CIVIL ACTION NO. 6:14-CV-02715

VERSUS                               JUDGE DOHERTY

U.S. COMMISSIONER,                   MAGISTRATE JUDGE HANNA
SOCIAL SECURITY
ADMINISTRATION

## REPORT  AND  RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the briefs of the parties, and the applicable law, it is recommended that the Commissioner's decision be REVERSED and REMANDED for further administrative action.

### ADMINISTRATIVE  PROCEEDINGS

The claimant, Gregneisha Johnson, fully exhausted her administrative remedies prior to filing this action in federal court.  In a ruling dated June 15, 2001,[1] the claimant was found to have been disabled since August 28, 2000 due to severe impairments of ADHD, ODD, and borderline intellectual functioning that satisfied

---

[1]       The ALJ's decision of August 30, 2013, which terminated the claimant's SSI benefits, references a June 22, 2001 decision.  (Rec. Doc. 14-2 at 29).  No such ruling was located in the record; however, the ALJ's notice of the June 15, 2001 decision is dated June 22, 2001. Accordingly, this appears to be simply a misstatement on the part of the ALJ.

Listing 112.05D, and she was awarded Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act.[2]  At that time, she was thirteen years old.[3]  When the claimant reached age eighteen, her disability was reconsidered, and she was again found to be disabled because she met the requirements of Listing 12.05C.[4]  On November 3, 2011, however, it was determined that she was no longer disabled.[5]

On May 10, 2006, the claimant applied for child's insurance benefits ("CIB") under Title II.[6]  The claimant was found to have been disabled as of November 1,

---

[2]     Rec. Doc. 5-1 at 407-409.

[3]     The claimant was born on November 7, 1987.  (Rec. Doc. 5-1 at 399).

[4]     The record references a ruling made on November 1, 2005, when the claimant was eighteen years old, that found she met Listing 12.05C.  (Rec. Doc. 5-1 at 93.)  However, the November 2005 ruling is not in the record.  There is a reference in the record to a hearing held on May 1, 2012 (Rec. Doc. 5-1 at 79), but no transcript of that hearing is in the record.  Furthermore, there is a three-page list of exhibits related to the time period from 2000 to 2001.  (Rec. Doc. 5-1 at 410-412).  Although these exhibits appear to have been germane to the original disability determination made in 2005, none of these exhibits are in the record.  These omissions made it extremely difficult for this Court to evaluate the claimant's appeal.

[5]     Rec. Doc. 14-2 at 29, 413.

[6]     Rec. Doc. 5-1 at 416.

2005[7] but on November 3, 2011, the claimant was found not to be disabled any longer.[8]

The government states, in its brief, that "the agency ceased [the claimant's] Title XVI benefits on November 3, 2011, following a fraud investigation."[9]  This statement implies that the claimant's benefits were stopped because of the findings of the fraud investigation.  The summary report of investigation[10] makes no finding that the claimant engaged in fraud and makes no recommendation that her benefits be stopped.  In support of its statement, the government cites to a document containing so many acronyms that it is largely incomprehensible.[11]  That document states that two Title II claims were "returned as cessations" because the claimant failed to cooperate at the "CE," assumed to be the consulting examination.  It is unclear whether this alleged failure to cooperate is the fraud referred to by the government.

---

[7]      The record does not contain a ruling dated November 1, 2005.  However, there are references to such a ruling in the record.  (Rec. Doc. 5-1 at 93; Rec. Doc. 14-2 at 13, 29).

[8]      Rec. Doc. 5-1 at 13, 423.

[9]      Rec. Doc. 20 at 6.

[10]      Rec. Doc. 5-1 at 232-236.

[11]      Rec. Doc. 5-1 at 78.

The determination that the claimant was no longer disabled was reconsidered by a state agency Disability Hearing Officer,[12] and on May 15, 2012, it was determined that the claimant's condition had improved to the point that she was no longer disabled.[13]   Two days later, the claimant requested a hearing before an administrative law judge.[14]   Another hearing request was made on June 5, 2012.[15]   A hearing was held a year later, on June 3, 2013.[16]

On November 22, 2011, the claimant applied for a period of disability and disability insurance benefits under Title II of the Social Security Act, alleging a disability onset date of January 1, 2008.[17]   The claim was denied on May 14, 2012.[18]

On August 30, 2013, Administrative law Judge ("ALJ") Nancy M. Pizzo rendered three decisions.  The first decision terminated the claimant's SSI benefits that had previously been awarded,[19] the second decision terminated the claimant's

---

[12]     Rec. Doc. 14-2 at 13, 29.

[13]     Rec. Doc. 5-1 at 90-97.

[14]     Rec. Doc. 5-1 at 107.

[15]     Rec. Doc. 5-1 at 111.

[16]     A transcript of the hearing is found in the record at Rec. Doc. 5-1 at 39-71.

[17]     Rec. Doc. 5-1 at 135.

[18]     Rec. Doc. 5-1 at 24, 73.

[19]     Rec. Doc. 5-1 at 29-41.

CIB benefits that had previously been awarded,[20] and the third decision denied the claimant's November 2011 application for disability insurance benefits.[21]

The claimant sought review of the ALJ's decisions, but the Appeals Council denied the request for review.[22]  Therefore, the ALJ's decisions became the final decisions of the Commissioner for the purpose of the Court's review pursuant to 42 U.S.C. § 405(g).  The claimant then filed this action seeking review of all three of the Commissioner's August 2013 decisions.

## FACTUAL BACKGROUND

The claimant was born on November 7, 1987.[23]  At the time of the ALJ's decisions, she was 25 years old.  She attended high school but received a certificate rather than a diploma.[24]  She then attended Young Memorial Technical College in an effort to obtain a high school equivalency diploma ("GED") but failed the program.[25] Between 2006 and 2010, she worked at various fast food establishments, including

---

[20]     Rec. Doc. 5-1 at 13-25.

[21]     Rec. Doc. 24-36.

[22]     Rec. Doc. 5-1 at 7-9; Rec. Doc. 14-2 at 2-4; Rec. Doc. 14-2 at 6-8.

[23]     Rec. Doc. 5-1 at 135.

[24]     Rec. Doc. 5-1 at 48-49.

[25]     Rec. Doc. 5-1 at 50-51, 251.

Taco Bell, Burger King, and McDonald's, for short time periods,[26] but was repeatedly fired because she was too slow.[27]

The record indicates that the claimant received mental health services including but not limited to the prescription of medications such as Zoloft, Geodon, and Lexapro, from Bayou Mental Health from 2005 to 2006,[28] when that facility closed.

On March 30, 2006, psychologist William E. Fowler performed a psychological evaluation at the request of the Office of Disability Determinations.  His report[29] indicates that the claimant seemed immature and childlike, worked at a slow pace, and was dramatic.  Testing revealed a verbal IQ of 71 (borderline), performance IQ of 64 (extremely low), and a full scale IQ of 65 (extremely low).  Dr. Fowler diagnosed the claimant with Bipolar Disorder I and mild mental retardation.

On April 21, 2006, consulting psychologist Linda R. Upton, Ph.D. employed a psychiatric review technique[30] and found that the claimant met Listing 12.05C based on a treating physician's diagnosis of Psychotic Disorder NOS and full scale IQ

---

[26]    Rec. Doc. 5-1 at 51-53, 142-147, 182.

[27]    Rec. Doc. 5-1 at 53, 58.

[28]    Rec. Doc. 5-1 at 248-253.

[29]    Rec. Doc. 5-1 at 298-300.

[30]    Rec. Doc. 5-1 at 301-314.

scores of 63[31] and 65.[32]  Dr. Upton also noted that the claimant had been receiving

mental health treatment since childhood.

The record indicates that the claimant received mental health services from

2007 to 2009 under the supervision of Dr. Stephen Poplar at the St. Mary Mental

Health Center in Morgan City, Louisiana.  Dr. Poplar diagnosed the claimant with

Psychotic Disorder, NOS with a history of ADHD and borderline intellectual ability

in July 2007 and prescribed Risperdal.[33]  He did not prescribe medication for her

ADHD at that time because the claimant had to leave the appointment.  He noted,

however, that medication for ADHD would be added in the future if her ADHD

symptoms did not improve.  Dr. Poplar made a similar diagnosis in February 2008.[34]

In July 2009, Dr. Poplar again diagnosed the claimant with Psychotic Disorder, Not

Otherwise Specified.[35]

In January 2010, Dr. Fowler again conducted a psychological evaluation of the

claimant.  The claimant's mother told Dr. Fowler that the claimant began psychiatric

---

[31]     Dr. Upton states that the claimant obtained this score on a test administered in 2001,
but the record does not include these test results or any psychological evaluation from 2001.

[32]     Dr. Upton referred to this test score as "current."  It is assumed that this is a reference
to the results of the testing administered by Dr. Fowler in 2006.

[33]     Rec. Doc. 5-1 at 330-333.

[34]     Rec. Doc. 5-1 at 323.

[35]     Rec. Doc. 5-1 at 322.

treatment at the age of eight or nine and was diagnosed with ADHD when she could not keep still or focused in school.  The claimant was not cooperative during the evaluation.  She looked away from the examiner, loudly scratched a book with a pen, hummed loudly, dragged out her responses for several minutes, loudly drummed her fingernails, covered her head with her blue jean jacket, chewed on her jacket, and spit pieces on the floor.  Dr. Fowler administered the WAIS-IV intelligence test.  The claimant achieved a 42 full scale score; however, because of the large number of near miss answers, Dr. Fowler suspected malingering or exaggeration of symptoms and stated that "the results are not considered to be reliable."

From 2010 to 2012, the claimant was treated for her mental health conditions at the Teche Action Clinic in Franklin, Louisiana.  Her first documented visit to that clinic was on November 17, 2010.[36]  It was noted that the claimant had a psychotic disorder with delusions, and she was experiencing auditory and visual hallucinations. Although her family gave a history that she had not had mental health treatment during the four previous years, that information is not consistent with the record, which shows that she had seen Dr. Poplar slightly more than a year earlier.  She was diagnosed with Psychosis NOS, rule out Schizophrenia and rule out Depression with

---

[36]     Rec. Doc. 5-1 at 351-353.

Psychotic Features.  On November 29, 2010, she was prescribed Geodon.[37]  On February 17, 2011,[38] the claimant's diagnosis was stated to be Unspecified Schizophrenia.  She had not returned to the clinic for two months, and she was unable to explain the two-month absence of care.  On February 24, 2011,[39] the treatment notes described her psychotic disorder as chronic and uncontrolled.  The claimant was seen at the clinic again on April 12, 2011.[40]  The diagnoses listed were Psychotic Disorder with Delusions and Unspecified Episodic Mood Disorder.  Her Geodon prescription was increased, and she was started on Lamictal.  The claimant returned to the clinic on June 7, 2011.[41]  Both her psychotic disorder and her mood disorder were described as chronic and uncontrolled.   The claimant reported that her medication was working because she no longer had auditory or visual hallucinations, her mood control was improved, and her thought processes were clearer.  The claimant was seen again on July 19, 2011[42] and on September 20, 2011.[43]  At that

---

[37]     Rec. Doc. 5-1 at 366-368.

[38]     Rec. Doc. 5-1 at 364-365.

[39]     Rec. Doc. 5-1 at 361-363.

[40]     Rec. Doc. 5-1 at 358-359.

[41]     Rec. Doc. 5-1 at 355-357.

[42]     Rec. Doc. 5-1 at 349-350.

[43]     Rec. Doc. 5-1 at 346-348.

time, she was feeling somewhat better and denied any hallucinations.  Her Geodon prescription was continued, the Lamictal dosage was increased, and she was started on Trazadone.  On February 29, 2012, the claimant returned to the clinic.[44]  She was again diagnosed with Psychotic Disorder with Delusions and Unspecified Episodic Mood Disorder.  Her medications were continued.

During the time that the claimant was being treated at the Teche Action Clinic, an investigation was conducted by the Cooperative Disability Investigations Unit. The claimant was interviewed by two Louisiana State Police detectives on June 2, 2011.  According to the summary report of investigation,[45] the "claimant failed to demonstrate any of the problems or behavior demonstrated" when she met with Dr. Fowler in January 2010.   According to the detectives, she "behaved perfectly normally. . . answered all questions appropriately, she was friendly, laughed and joked with the detectives, demonstrated good memory and communication skills, and freely provided information."  According to the report, "claimant demonstrated no evidence of any type of mental, social, behavioral, or medical problem.  Claimant had no symptoms of depression, anxiety, or paranoia."  However, the report does not make a finding regarding any alleged fraud or a recommendation concerning the

---

[44]     Rec. Doc. 5-1 at 343-345.

[45]     Rec. Doc. 5-1 at 232-236.

-10-

continuation of her disability benefits, and there is no indication that the detectives had any kind of specialized training in the fields of medicine, psychology, or psychiatry that would qualify them to diagnose medical or mental conditions or give opinions with regard to such conditions.

The claimant was again evaluated by Dr. Fowler at the request of the Office of Disability Determinations on August 25, 2011.[46]  Dr. Fowler noted that the claimant was not cooperative during the interview.  Her mood was silly and exaggerated, and Dr. Fowler found "no evidence of psychotic affect."  Dr. Fowler again found that the claimant was malingering.

On November 3, 2011, consultant Joseph Tramontana, Ph.D., attempted to complete a psychiatric review technique but found that there was "insufficient evidence in [the] file to appropriately assess this case due to failure to cooperate by claimant.  Credibility is an issue."[47]

A year and a half later, on July 2, 2013, the claimant was evaluated by psychologist Scuddy F. Fontenelle, III.[48]  Although the history given to Dr. Fontenelle by the claimant was not entirely consistent with the information in the record, Dr.

---

[46]     Rec. Doc. 5-1 at 371-374.

[47]     Rec. Doc. 5-1 at 376-388.

[48]     Rec. Doc. 5-1 at 392-395.

Fontenelle administered the WAIS-IV test and obtained scores consistent with the earlier valid intelligence tests in the record.  Her full scale score on the test was 62. Dr. Fontenelle explained in his report that the claimant was immature, childlike, and playful as well as active, restless, fidgety, and apprehensive.  He found her pace and concentration to be marginal, and opined that she "is unable to handle work related responsibilities."  There is nothing in Dr. Fontenelle's report indicating that the claimant was malingering or that the test scores were invalid.  Dr. Fontenelle also completed a medical source statement of ability to do work-related activities (mental).[49]  He found that the claimant had moderate limitations in the ability to understand and remember simple instructions and in the ability to carry out simple instructions.  He found that she had marked limitations in four other categories:  the ability to make judgments on simple work-related decisions, the ability to understand and remember complex instructions, the ability to carry out complex instructions, and the ability to make judgments on complex work-related decisions.  He noted that the claimant "is unable to perform multi-step vocational tasks."  Dr. Fontenelle also evaluated the claimant's ability to interact with others.  He found that she has marked limitations in her ability to interact appropriately with the public, and extreme limitations in three additional categories:  the ability to interact appropriately with

---

[49]     Rec. Doc. 5-1 at 396-398.

supervisors, the ability to interact appropriately with coworkers, and the ability to respond appropriately to usual work situations as well as changes in a routine work setting. Dr. Fontenelle noted that the claimant "can be distracted, psychotic, and respond to internal simulation."

At the time of the hearing in June 2013, the claimant was taking three prescription medications for her mental health conditions – Trazadone, Lamortrigine, and Geodon – all of which were prescribed by Dr. Ed Bergeron of the Teche Action Clinic.[50]

In the claimant's first application for benefits, she alleged that her disability commenced on January 1, 1992.[51] The Commissioner found that she had severe impairments of ADHD, ODD, borderline intellectual functioning, and enuresis and that her impairments were disabling beginning on August 28, 2000 because they satisfied Listing 112.05D.[52] In August 2013, the Commissioner reversed this ruling, finding that the claimant's condition had improved to the extent that she was no longer disabled.

---

[50]     Rec. Doc. 5-1 at 230.

[51]     Rec. Doc. 5-1 at 399.

[52]     Rec. Doc. 5-1 at 407-409.

The claimant applied for child's insurance benefits in 2006,[53] and the Commissioner found her disabled as of November 1, 2005.[54]  In August 2013, however, the Commissioner reversed that ruling, finding that the claimant's condition had improved to the extent that she was no longer disabled.

In her most recent application for benefits, in 2011, the claimant alleged that she became disabled on January 1, 2008[55] due to behavior problems,[56] psychotic disorder, and mental retardation.[57]  That application was denied.

The claimant now challenges all three of the August 2013 rulings.

## ANALYSIS

### A.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[58]  "Substantial evidence

---

[53]    Rec. Doc. 5-1 at 416.

[54]    Rec. Doc. 5-1 at 13.

[55]    Rec. Doc. 5-1 at 135.

[56]    Rec. Doc. 5-1 at 165.

[57]    Rec. Doc. 5-1 at 191.

[58]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

-14-

is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[59]  Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[60]

If the Commissioner's findings are supported by substantial evidence, then they are conclusive and must be affirmed.[61]  In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[62]  Conflicts in the evidence and credibility assessments are for the Commissioner to resolve, not the courts.[63]  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective

---

[59]     *Villa v. Sullivan*, 895 F.2d at 1021-22 (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)).

[60]     *Hames v. Heckler*, 707 F.2d at 164 (quoting *Hemphill v. Weinberger*, 483 F.2d 1137. 1139 (5th Cir. 1973), and *Payne v. Weinberger*, 480 F.2d 1006, 1007 (5th Cir. 1973)).

[61]     42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173; *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000).

[62]     *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1021; *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Carey v. Apfel*, 230 F.3d at 135; *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).

[63]     *Martinez v. Chater*, 64 F.3d at 174.

-15-

medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[64]

## B.   Entitlement to Benefits

The Disability Insurance Benefit ("DIB") program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[65]  Every individual who meets certain income and resource requirements, has filed an application for benefits, and is determined to be disabled is eligible to receive Supplemental Security Income ("SSI") benefits.[66]

The term "disabled" or "disability" means the inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[67]  A claimant shall be determined to be disabled only if his physical or mental impairment

---

[64]     *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991); *Martinez v. Chater*, 64 F.3d at 174.

[65]     See 42 U.S.C. § 423(a).

[66]     42 U.S.C. § 1382(a)(1) & (2).

[67]     42 U.S.C. § 1382c(a)(3)(A).

or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[68]

## C.   THE ALLEGATIONS OF ERROR

In this case, three separate rulings of the ALJ are under review:  (1) an SSI ruling; (2) a CIB ruling; and (3) the claimant's SSDI claim.  The SSI and CIB rulings both terminated benefits, while the SSDI ruling denied the claimant's application for benefits.

The claimant contends that the Commissioner's rulings are flawed in five ways. First, the claimant alleges that the record is incomplete.  This assignment of error will not be addressed because it was remedied when the record was supplemented after the appellant's brief was filed.  Second, the claimant contends that the ALJ erred in picking and choosing from the record only the evidence that supports her conclusions. Third, the claimant contends that the ALJ erred in finding that the claimant is not disabled because the record does not demonstrate that the claimant is no longer

---

[68]      42 U.S.C. § 1382c(a)(3)(B).

mentally retarded.  Fourth, the claimant contends that the Commissioner did not meet her burden of proving medical improvement.  Finally, the claimant contends that the ALJ's finding that she is not disabled is not supported by substantial evidence because the record does not demonstrate that the claimant can sustain work activity.

D.     **ANALYSIS OF THE RULINGS THAT TERMINATED THE CLAIMANT'S SSI AND CIB BENEFITS**

The August 2013 decisions that terminated the claimant's SSI and CIB benefits as of November 3, 2011 are virtually identical and employed the same reasoning. Therefore, those two rulings will be analyzed together.

In termination cases, the Commissioner may discontinue Social Security benefits if substantial evidence demonstrates that:  (1) there has been medical improvement related to an individual's ability to work, and (2) the individual is now able to engage in substantial gainful activity.[69]

Medical improvement is any decrease in the medical severity of a claimant's impairment, which was present at the time of the most recent favorable medical decision that the claimant was or continued to be disabled.[70]  The determination of a decrease in medical severity must be based on changes (i.e., improvement) in the

---

[69]     42 U.S.C. § 423(f); 20 C.F.R. § 404.1594(a).

[70]     20 C.F.R. § 404.1594(b)(1).

symptoms, signs, and/or laboratory findings associated with the impairments.[71] Medical improvement is related to the ability to do work if the improvement increases the claimant's functional capacity to do basic work activities.[72]  Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit."[73]  The ability to engage in substantial gainful activity is determined through an "objective assessment of [the] functional capacity to do basic work activities" and a consideration of vocational factors.[74]

The ALJ found that the most recent favorable medical decision finding that the claimant was disabled, also known as the "comparison point decision" or "CPD" was the decision dated November 1, 2005.[75]  This Court is hampered by the fact that the comparison point decision is not included in the record.  This Court cannot compare the findings made in November 2005 with those made by the ALJ in 2013.  However, this Court accepts as true the ALJ's representation that the November 2005 ruling found that the claimant had borderline intellectual functioning and a mood disorder that satisfied Listing 12.05C.

---

[71]     20 C.F.R. § 404.1594(b)(1).

[72]     20 C.F.R. § 404.1594(b)(1), § 404.1594(b)(3).

[73]     *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

[74]     20 C.F.R. § 404.1594(b)(5).

[75]     Rec. Doc. 14-2 at 15, 31.

Listing 12.05, which addresses intellectual disability, is comprised of two parts, each of which must be satisfied in order for the listing to be met. The first part requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." The second part requires that the deficit in intellectual functioning be of such severity that at least one of four possible severity requirements is satisfied. The severity portion of the listing reads as follows:

> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> A.   Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;
>
> OR
>
> B.   A valid verbal, performance, or full scale IQ of 59 or less;
>
> OR
>
> C.   A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>
> OR
>
> D.   A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>
>> 1.   Marked restriction of activities of daily living; or

-20-

2.      Marked difficulties in maintaining social functioning; or

3.      Marked difficulties in maintaining concentration, persistence, or pace; or

4.      Repeated episodes of decompensation, each of extended duration.

There is no evidence that the severity criteria of Paragraphs A or B are satisfied in this case. The 2005 ruling found that the claimant satisfied Listing 12.05C. Thus, the Commissioner found, at that time, that the claimant had a valid full scale IQ score between 60 and 70 and another impairment that limited her work-related functioning. It must be presumed that the other impairment was the claimant's mood disorder, which according to the ALJ was recognized in the 2005 ruling.

In 2013, the ALJ found that the medical evidence in the record establishes that the claimant did not develop any additional impairments after the 2005 ruling.[76] This Court finds that this finding is not based on substantial evidence in the record. The record shows that in March 2006, consultative examiner Dr. Fowler diagnosed the claimant with Bipolar Disorder I. In April 2006, consulting psychologist Dr. Upton found that the claimant satisfied Listing 12.05C based on full scale IQ scores of 63 and 65 and a treating physician's diagnosis of Psychotic Disorder, Not Otherwise

---

[76]      Rec. Doc. 14-2 at 15, 31.

Specified.[77]   In the August 2013 ruling with regard to the claimant's application for SSDI benefits, the ALJ claimed to give significant weight to the claimant's treating physician, Dr. Poplar.[78]   In deciding to terminate the claimant's SSI and CIB benefits, however, the ALJ could conclude that the claimant had no new impairments only by ignoring Dr. Poplar's diagnoses of Psychotic Disorder, Not Otherwise Specified, which were made in July 2007, February 2008, and July 2009.  In 2010, the claimant was diagnosed with Psychosis, NOS; in February 2011, she was diagnosed with Unspecified Schizophrenia; in April 2011, she was diagnosed with Psychotic Disorder with Delusions and also with Unspecified Mood Disorder.  In February 2012, she was again diagnosed with Psychotic Disorder with Delusions and Unspecified Mood Disorder.  The only way the ALJ could reach the conclusion that the claimant had developed no new impairments after 2005 was by ignoring all of the evidence in the record related to these diagnoses.  Thus, the ALJ's finding is not supported by substantial evidence in the record.

The ALJ's error was compounded when she stated that she "specifically considered" whether Listing 12.05C was satisfied[79] but failed to discuss whether any

---

[77]      Rec. Doc. 5-1 at 301-313.

[78]      Rec. Doc. 5-1 at 34.

[79]      Rec. Doc. 14-2 at 15, 31.

diagnoses listed in the preceding paragraph affected the claimant's ability to function in the work place and also failed to discuss whether the mood disorder recognized in 2005 satisfied the Paragraph C criteria.  The ALJ's conclusion that the claimant does not meet Listing 12.05 is based solely on her analysis of Paragraph D criteria rather than Paragraph C criteria.  The ALJ erred in failing to discuss the Paragraph C criteria in reaching her decision that the claimant did not satisfy a listing in November 2011.

Furthermore, the claimant argues that the ALJ's findings are not based on the evidence in the record as a whole but are instead based on the ALJ's concentration on or "picking and choosing" to discuss only the evidence that supported a finding that the claimant is not disabled and ignoring evidence that supported a finding that the claimant is disabled.  This Court agrees that, with regard to the ALJ's analysis of the Paragraph D criteria, the ALJ erred by failing to consider all of the relevant evidence.

When analyzing the Paragraph D criteria, an ALJ must determine whether the claimant's impairments resulted in marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation.  This Court agrees with the ALJ that no episodes of decompensation are documented in the record.  With regard to the other three criteria, however, the

ALJ "picked and chose" evidence to support her conclusion without considering all relevant evidence.

For example, the ALJ found that the claimant has moderate difficulty in social functioning because she is able to sing in the church choir and go on trips with her church group.[80]  There is evidence that the claimant sang in the choir and went on trips in 2008[81] but no evidence that such activity was continuing at the time of the hearing.[82]  There also is evidence that the claimant spends most of her time in her room playing with her dolls and has no friends.[83]  With regard to concentration, persistence, or pace, the ALJ found that the claimant has moderate difficulties. Although the ALJ acknowledged that the claimant was fired from multiple jobs for being too slow, she noted that the claimant is able to do puzzle books and play poker on her phone.  The fact that the claimant stated that she attempts to solve word search puzzles and attempts to play poker on a cell phone does not evidence her ability to concentrate – particularly over a full work day – or the pace at which she functions. Furthermore, Dr. Fowler observed in 2006 that her pace was slow,[84] and Dr.

---

[80]     Rec. Doc. 14-2 at 16, 31.

[81]     Rec. Doc. 5-1 at 325.

[82]     Rec. Doc. 5-1 at 67.

[83]     Rec. Doc. 5-1 at 61-63.

[84]     Rec. Doc. 5-1 at 299.

Fontenelle opined in July 2013 that her pace and concentration were marginal.[85]  Dr.

Fontenelle also opined that the claimant would have extreme difficulty interacting

appropriately with supervisors and coworkers and to responding to usual work

situations as well as changes in routine work situations.  Dr. Fowler's and Dr.

Fontenelle's opinions in this regard were ignored by the ALJ.  "[T]he ALJ must

consider all the record evidence and cannot 'pick and choose' only the evidence that

supports his position."[86]  Accordingly, this finding is not supported by substantial

evidence in the record.

The ALJ's next finding is that the claimant's condition improved medically

between the November 2005 ruling and November 3, 2011, accompanied by a

decrease in the severity of her impairments.  Such a finding must be supported by

changes (i.e., improvement) in the symptoms, signs, and/or laboratory findings

associated with the impairments.  For this conclusion to be valid, the record must

document an improvement either in the claimant's full scale IQ scores or in her mood

disorder.

First, there is no evidence in the record supporting a conclusion that the

claimant's intellectual functioning (as documented by IQ scores) improved between

---

[85]     Rec. Doc. 5-1 at 395.

[86]     *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000).

2005 and 2011.  In 2000 and again in 2006, the claimant achieved a full scale IQ score of 65.  In 2010, she scored even lower but Dr. Fowler, the psychologist who administered the test, opined that it was invalid.  In 2011, Dr. Fowler declined to administer an IQ test because he again found the claimant to be malingering.  In 2013, however, Dr. Fontenelle administered an IQ test on which the claimant achieved a full scale score of 62.  Neither the 2010 or 2011 evaluations by Dr. Fowler documented an improvement in the claimant's intellectual abilities; therefore, those evaluations do not support the conclusion that the claimant's condition improved between 2005 and 2011.  The ALJ attempted to discredit the most recent intelligence test on the basis that it was inconsistent with the earlier invalid test.  But the ALJ failed to note that the most recent test is fully consistent with the two earlier intelligence tests. Certainly, there are some inconsistencies between historical information set forth in Dr. Fontenelle's report with factual information found elsewhere in the record due to the claimant and her mother both being poor historians, but the ALJ's conclusion that the "claimant's effort [on the test administered by Dr. Fontenelle] was questionable as is the validity of the subsequent IQ score"[87] is not based on substantial evidence. Indeed, the fact that the claimant scored twenty points higher on the test administered by Dr. Fontenelle than on the 2010 test and only three points lower than on the 2001

---

[87]      Rec. Doc. 14-2 at 21, 37.

and 2006 tests indicates that Dr. Fontenelle's test results were valid.  Thus, there is no evidence in the record establishing that the claimant's IQ is higher than 65. Consequently, there is no evidence in the record showing that the claimant's IQ improved between 2005 and 2011.

Second, there is no evidence in the record establishing that the claimant's mood disorder no longer interferes with her functioning.  Although there is some evidence that the claimant's mood sometimes improved,[88] particularly with medication, she continued to receive treatment for a mood disorder from 2005 through 2012.  In March 2006, she reported psychotic and mood symptoms to Dr. Fowler.[89]  In July 2013, Dr. Fontenelle described her mood as immature, childlike, and playful, and he described her affect as active, restless, and fidgety.  She appeared apprehensive and demonstrated responses to internally-generated impulses.  He found her thinking to be disordered and her perception of reality to be poor.  Therefore, to the extent that the ALJ concluded that the claimant's mood disorder improved between 2005 and 2011, that conclusion is not supported by substantial evidence in the record.

---

[88]     See, e.g., Rec. Doc. 5-1 at 237 (on February 23, 2006, the claimant's "mood is stable and usually quite cheerful.")

[89]     Rec. Doc. 5-1 at 300.

Since Social Security benefits may not be terminated without a finding of medical improvement,[90] and there is no evidence of improvement in the claimant's IQ score or mood disorder, as well as evidence of additional mental conditions having been diagnosed after 2005, the ALJ erred in terminating the claimant's benefits. This Court having concluded that the ALJ erred in finding medical improvement, remand is warranted and the analysis could stop at this point. For completeness, however, this Court will proceed with the second part of the required analysis.

The second part of the evaluation process that must be applied to a termination case relates to the claimant's ability to engage in substantial gainful activity. In making this determination, the Commissioner utilizes a seven-step sequential analysis for the termination of a Title XVI claim, and an eight-step sequential analysis for termination of a Title II claim.[91] The analysis is basically the same except that with regard to the SSI claim under Title XVI, the performance of substantial gainful activity is not considered.

The first question to be considered is whether the claimant engaged in substantial gainful activity ("SGA"). If so, the claimant's disability has ended. In

---

[90]     *Hallaron v. Colvin*, 578 F. App'x 350, 353 (5th Cir. 2014), citing 42 U.S.C. § 1382c(a)(4)(A).

[91]     20 C.F.R. § 416.994(f) and 20 C.F.R. § 404.1594(f).

this case, the evidence shows that the claimant attempted to work primarily in fast food restaurants and did reach SGA levels in a few months.  However, she was not able to sustain SGA-level employment.  Therefore, this question must be answered in the negative.

The second question is whether the claimant has an impairment or combination of impairments that meets or equals the severity of a listed impairment.  If so, the disability is continuing.  The ALJ found that the claimant has not had an impairment or combination of impairments that meets or medically equals the severity of a listed impairment since November 3, 2011.  This Court finds that the ALJ's conclusion in that regard was reached in error because it is not supported by substantial evidence in the record.  As noted above, the ALJ failed to consider the mental conditions diagnosed after 2005 and failed to consider whether the claimant meets Listing 12.05C.

The third question to be asked is whether there has been medical improvement.  As explained above, this Court finds that the ALJ erred in finding that the claimant has experienced medical improvement.

The fourth question is whether medical improvement, if found, is related to the claimant's ability do work.  In this case, the ALJ found that the "medical improvement is related to the ability to work because, as of November 3, 2011, the claimant no

longer had an impairment or combination of impairments that met or medically equaled the same listing. . . that was met at the time of the CPD."[92]  This Court has already explained that the ALJ erred in finding that the claimant's impairments no longer met or equaled a listing.  Therefore, this related finding was not supported by substantial evidence in the record.

The next two questions are used when there is a finding by the Commissioner of no medical improvement, or a finding of medical improvement not related to the claimant's ability to work.  Accordingly, they are inapplicable in this case.

The seventh question is whether the claimant is able to engage in past relevant work.  If so, the disability has ended.  In this case, the ALJ found that the claimant cannot perform her past work.  Accordingly, the answer to this question cannot be used as a basis to terminate the claimant's benefits.

The final question is whether the claimant is able to perform other substantial gainful activity.  The plaintiff argues that she is not able to sustain any type of employment over an eight-hour work day and a forty-hour work week.  An ALJ is not required to make a finding regarding a claimant's ability to maintain employment in every case.[93]  Inherent in the definition of residual functional capacity is the

---

[92]     Rec. Doc. 14-1 at 34.

[93]     *Frank v. Barnhart*, 326 F.3d 618, 619 (5th Cir. 2003).

understanding that the claimant has an ability to work on a sustained basis.[94]  Thus, "[u]sually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment."[95]  In fact, such a finding is necessary only when "by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms."[96]  There is no evidence in this case that the claimant has the type of impairment that requires such a finding.  Therefore, the claimant's argument lacks merit.  However, the ALJ's conclusion that the claimant is able to perform other jobs in the national economy despite her impairments is predicated on the erroneous conclusions outlined above.  Therefore, this conclusion also fails to be supported by substantial evidence.

In a benefits termination proceeding, such as this one, the Commissioner bears the burden of proof and may terminate benefits only if substantial evidence demonstrates (1) that the claimant has undergone medical improvement related to his ability to do work, and (2) that the claimant is currently able to engage in substantial

---

[94]    *Dunbar v. Barnhart*, 330 F.3d 670, 671 (5th Cir. 2003).

[95]    *Frank v. Barnhart*, 326 F.3d at 619.

[96]    *Frank v. Barnhart*, 326 F.3d at 619.

gainful activity.[97]  The Commissioner did not satisfied his burden on either of those points.  Accordingly, this Court recommends that the Commissioner's decision terminating the claimant's SSI and CIB benefits should be reversed.

## E.  ANALYSIS OF THE RULING THAT DENIED THE CLAIMANT'S APPLICATION FOR SSDI BENEFITS

The third decision rendered in August 2013 denied the claimant's application for SSDI benefits based on her own earnings.

### 1.  EVALUATION PROCESS AND BURDEN OF PROOF

For this type of claim, the Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled.  At step one, an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.  At step two, an individual who does not have a severe impairment will not be found disabled.  At step three, an individual who meets or equals an impairment listed in the regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1 will be considered disabled without consideration of vocational factors.  If an individual is capable of performing the work he has done in the past, a finding of not disabled will be made at step four.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work

---

[97]      *Griego v. Sullivan*, 940 F.2d 942, 943–44 (5th Cir. 1991).

experience, and residual functional capacity will be considered to determine if the claimant can perform any other work at step five.[98]

Before going from step three to step four, the Commissioner assesses the claimant's residual functional capacity[99] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[100]  The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[101]

The claimant bears the burden of proof on the first four steps.[102]  At the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[103]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by

---

[98]     20 C.F.R. § 404.1520; see, e.g., *Wren v. Sullivan*, 925 F.2d at 125; *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Masterson v. Barnhart*, 309 F.3d 267, 271-72 (5th Cir. 2002); *Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000).

[99]     20 C.F.R. § 404.1520(a)(4).

[100]     20 C.F.R. § 404.1545(a)(1).

[101]     20 C.F.R. § 404.1520(e).

[102]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[103]     *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

expert vocational testimony, or by other similar evidence.[104]   If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[105]   If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[106]

### 2.    THE ALJ'S FINDINGS AND CONCLUSIONS

In the ruling on the claimant's application for SSDI benefits, the ALJ found, at step one, that the claimant has not engaged in substantial gainful activity since her alleged disability onset date of January 1, 2008 through her date last insured, which was March 31, 2012.[107]   This finding is supported by the evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  borderline intellectual functioning and mood disorder.[108]   This finding is supported by evidence in the record.   However, it overlooks the diagnoses of various mental conditions made after 2005.

---

[104]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[105]    *Perez v. Barnhart*, 415 F.3d at 461; *Masterson v. Barnhart*, 309 F.3d at 272; *Newton v. Apfel*, 209 F.3d at 453.

[106]    *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992), citing *Johnson v. Bowen*, 851 F.2d 748, 751 (5th Cir. 1988).  See, also, 20 C.F.R. § 404.1520(a)(4).

[107]    Rec. Doc. 5-1 at 424.

[108]    Rec. Doc. 5-1 at 424.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[109]  The claimant challenges this finding.

The ALJ found that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  she would need to work in an environment free of fast-paced production requirements, involving simple work-related decisions, routine workplace changes, and simple, routine and repetitive tasks; she would be required to concentrate for two-hour blocks of time; and she would have only occasional direct interaction with the public.[110]  The claimant contests this finding, arguing that she is unable to sustain employment over an eight-hour day and a forty-hour week.  As noted above, however, the claimant does not have the type of impairment that requires a separate finding with regard to the ability to sustain employment.

At step four, the ALJ found that the claimant is not capable of performing any past relevant work.[111]  This finding is supported by the evidence in the record.

---

[109]    Rec. Doc. 5-1 at 424-425.

[110]    Rec. Doc. 5-1 at 27.

[111]    Rec. Doc. 5-1 at 34.

At step five, the ALJ found that the claimant was not disabled from her alleged disability onset date of January 1, 2008 through March 31, 2012, the date last insured because there are jobs in the national economy that she can perform.[112]  The claimant challenges this finding.

### 3.   THE ALJ'S FINDINGS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE IN THE RECORD

In the SSDI ruling, as in the rulings terminating the claimant's SSI and CIB benefits, the ALJ found that the claimant does not have an impairment or combination of impairments that meets or equals a listing.  The claimant challenges that finding. In reaching that conclusion, the ALJ erred by failing to consider whether any of the mental conditions with which the claimant has been diagnosed other than her mood disorder satisfy the Paragraph C criteria of Listing 12.05.  The ALJ also erred in evaluating the Paragraph D criteria by picking and choosing evidence to support her conclusion rather than considering all of the evidence in the record.  The ALJ also erred in failing to find that the results of the IQ test administered by Dr. Fontenelle in 2013 were consistent with earlier valid IQ tests.  The ALJ stated that "the findings of Dr. Fontenelle. . . are inconsistent with the evidence of record."[113]  This Court

---

[112]      Rec. Doc. 5-1 at 36.

[113]      Rec. Doc. 5-1 at 33.

disagrees and finds that Dr. Fontenelle's findings are consistent with the findings of psychological evaluations conducted before 2010. Because of these errors, the ALJ's conclusion that the claimant's impairments do not meet a listing are not supported by substantial evidence, and the ALJ's decision should be reversed.

The ALJ's residual functional capacity evaluation focused in large part on the claimant's credibility. It is apparent from the record that both the claimant and her mother are poor historians, and the histories they gave to health care providers resulted in various factual inconsistencies in the record. Additionally, the ALJ relied upon an investigation conducted by the Louisiana State Police for the Cooperative Disability Investigations Unit concerning suspected fraud. The investigation summary in the record does not make findings of fraud nor does it recommend that the claimant's benefits be terminated due to fraud. However, the investigators described the claimant's behavior during their interview of her and noted that she showed no symptoms of depression, anxiety, paranoia, or any medical condition and did not act the same way during the interview that she did during Dr. Fowler's interviews in 2010 and 2011 when he found that she was malingering. The ALJ stated that "it is common practice in disability hearings to consider 3rd party statements and as such, the undersigned accords significant weight to the findings."[114]

---

[114]     Rec. Doc. 5-1 at 33.

Although the ALJ is tasked with weighing the evidence in the record,[115] this Court finds that the ALJ erred in relying on the investigative report.  There is no evidence that the investigators were trained to diagnose or recognize the symptoms of mental disorders such as depression, paranoia, or anxiety.  Therefore, their statements concerning whether the claimant exhibited the symptoms of such conditions has no evidentiary value.

Having found that the ALJ erred, this Court recommends that the ALJ's ultimate decision that the claimant was not disabled between January 1, 2008 and March 31, 2012 should be reconsidered.

## CONCLUSION AND RECOMMENDATION

This Court finds that the ALJ erred in finding that the claimant's SSI and CIB benefits should be terminated and in denying the claimant's application for a period of disability and disability insurance benefits.  Accordingly,

**IT IS THE RECOMMENDATION** of this Court that the three decisions of the Commissioner rendered in August 2013 be **REVERSED and REMANDED** to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to (1) determine whether the claimant's mental conditions, variously

---

[115]     *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994); *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

-38-

described in the record as Bipolar Disorder I; Psychotic Disorder, Not Otherwise Specified; Psychosis, NOS; Unspecified Schizophrenia; Psychotic Disorder with Delusions; and Unspecified Mood Disorder, together with her most recent full scale IQ score of 65, satisfied the requirements for Listing 12.05C at any time on or after November 3, 2011; (2) determine whether the claimant satisfied the requirements for Listing 12.05D at any time on or after November 3, 2011; (3) determine whether the claimant's mental conditions, other than her mood disorder, were severe impairments at any time between her alleged disability onset date of January 1, 2008 through March 31, 2012, her date last insured; (4) permit the claimant to supplement the record as appropriate or necessary; (5) again evaluate the claimant's residual functional capacity; (6) again evaluate whether the claimant's medical condition improved so that she was no longer disabled as of November 3, 2011; and (7) again evaluate whether the claimant was disabled on or after January 1, 2008.

Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act (EAJA).[116]

---

[116]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir.1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.  See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).

Signed in Lafayette, Louisiana, this 5th day of January 2016.

_____

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE


COPY SENT:

DATE:   1/5/2016
BY:        EFA
TO:        RFD
                cg

-40-